UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MATSON WILLIS, et al., | ) | |
|     *Plaintiffs*, | ) | |
| | ) | |
|     *vs.* | ) | 1:09-cv-815-JMS-DML |
| | ) | |
| COMMISSIONER, INDIANA DEPARTMENT OF | ) | |
| CORRECTION, et al., | ) | |
|     *Defendants*. | ) | |

## ORDER

Presently before the Court are the parties' Cross-Motions for Summary Judgment,[1] [dkt.

80; 83], in this action seeking enforcement of inmates' rights to obtain kosher meals to properly

exercise their religious beliefs during their incarceration at the Indiana Department of Correction.

## I.

### STANDARD OF REVIEW

A motion for summary judgment asks that the Court find that a trial based on the uncon-

troverted and admissible evidence would – as a matter of law – conclude in the moving party's

favor and is thus unnecessary. *See* Fed. R. Civ. Pro. 56(c). When evaluating a motion for sum-

mary judgment, the Court must give the non-moving party the benefit of all reasonable infe-

rences from the evidence submitted and resolve "any doubt as to the existence of a genuine issue

for trial...against the moving party." *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986).

Nevertheless, "the Court's favor toward the non-moving party does not extend to drawing infe-

rences that are supported by only speculation or conjecture." *Singer v. Raemisch*, 593 F.3d 529,

---

[1] Mr. Willis represents a certified class of inmates confined within the Indiana Department of Correction, including the New Castle Correctional Facility, who have identified, or who will identify, themselves to the Indiana Department of Correction as requiring a kosher diet in order to properly exercise their religious beliefs and who have requested such a diet, or would request it if such a diet was available. [Dkt. 47.] As explained later, Mr. Willis also presents an individual claim.

533 (7th Cir. 2010). The non-moving party must set forth specific facts showing that there is a material issue for trial and cannot rely upon the mere allegations or denials in the pleadings. Fed. R. Civ. Pro. 56(e); *Celotex*, 477 U.S. 317. Moreover, the non-moving party must do more than just demonstrate a factual disagreement between the parties; it must demonstrate that the disputed factual issue is "material." *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001). The key inquiry is the existence of evidence to support a plaintiff's claims or affirmative defenses, not the weight or credibility of that evidence, both of which are assessments reserved to the trier of fact. *See Schacht v. Wis. Dep't of Corrections*, 175 F.3d 497, 504 (7th Cir. 1999).

Cross-motions for summary judgment do not automatically mean that all questions of material fact have been resolved. *Franklin v. City of Evanston*, 384 F.3d 838, 842 (7th Cir. 2004). The Court must evaluate each motion independently, making all reasonable inferences in favor of the nonmoving party with respect to each motion. *Id.* at 483.

After having assessed the claims of the parties in accordance with the standards outlined above, the Court concludes that Mr. Willis, on behalf of the class, is entitled to summary judgment on Count I, and that Mr. Willis is individually entitled to declaratory relief as to Count II. Therefore, in what follows, the Court makes all reasonable factual inferences in favor of the Defendants (collectively, the "DOC," unless otherwise indicated) with respect to the class claims. With respect to Mr. Willis's individual claims, the Court will draw all reasonable inferences in favor of the non-moving party. *See* Fed. R. Civ. Pro. 56(c).

## II.

### BACKGROUND

This action involves a claim for class relief, as well as a claim for individual relief. On behalf of the class previously defined by this Court, Mr. Willis argues that the denial of kosher meals violates the religious rights of all the class members. [Dkt. 81 at 1.] In an individual ca-

pacity, Mr. Willis further argues that being deprived his religious meal card after failing to eat at least 75 percent of his meals violated his individual First Amendment rights. [*Id.* at 2.]

## A) DOC's Food Service

Since 2005, the DOC has contracted with Aramark Correctional Services, Inc. ("Aramark") to provide food services for inmates. [Dkt. 84 at 3.] The contract, which is updated annually, establishes a per-meal price that is multiplied by the daily inmate census and charged accordingly. [*Id.*] In 2009, each meal cost $1.154. [*Id.*] The DOC's contract with Aramark originally provided that kosher meals would be billed to the DOC on top of the amount already billed based on population figures. In 2005, the cost of kosher meals ranged from $3.99 to $4.11 per meal. [*Id.*]

All DOC facilities have kitchens staffed by Aramark employees. [*Id.* at 4.] Each kitchen area has preparation, cooking, distribution, and cleaning areas. [*Id.*] In larger facilities, trays, glasses, utensils, and some pots and pans are washed in large commercial dishwashers; the larger food preparation items are washed in three-bay sinks. [*Id.*] In smaller facilities, all items are washed in three-bay sinks. [*Id.*]

## B) Keeping Kosher

The DOC acknowledges that keeping kosher is an intrinsic element of the faith of some Jews. [*Id.*] Historically, the DOC has also permitted even non-Jews who have a sincerely held religious reason for requesting kosher meals to obtain them. [*Id.* at 7.]

The laws of kosher address a comprehensive dietary system – including not only the types of foods that may be eaten, but also the preparation requirements, which ensure kosher ingredients are not "contaminated" by non-kosher ingredients. [Dkt. 80-1 at 3.] An assurance against the possibility of "contamination" is a crucial part of the laws of kosher. [Dkt. 83-14 at 7.] According to the laws of kosher, dairy and meat, both of which must be kosher in their core

ingredients, must be totally separated during preparation and consumption; they may neither be served at the same meal nor mixed with plates/utensils that have touched the other category of food. [*Id.* at 7-8; dkt. 80-1 at 5.] Observant Jews wait one hour after consuming dairy before eating meat and six hours after consuming meat before eating dairy. [Dkt. 80-1 at 4.] The same is true for anything touching the foods, e.g., plates, utensils, glasses. [*Id.* at 5.] Although the laws of kosher are traditionally complicated, one fundamental tenet is non-contamination of kosher food products with non-kosher products during and after preparation – as such, kosher food must be carefully supervised through the phases of production. [Dkt. 80-1 at 3.]

**C) Past DOC Practice Regarding the Preparation of Kosher Meals**

In the past, the DOC has ensured non-contamination of kosher meals by having them cooked and then frozen offsite by a certified kosher food vendor contracted by Aramark. [Dkt. 84 at 5.] The meals would then be heated at the facilities and supplemented by other foods made with kosher ingredients (the latter of which were prepared at the facilities without utensils). [*Id.*] Everything in the prepackaged kosher meals, as well as the utensils and cups used to serve them, was single-use and disposable. [*Id.*]

DOC policy required authorization of religious personal preference diets – inmates with special diets were issued diet cards. [*Id.*] The number of kosher meals prepared corresponded with the number of inmates with kosher personal preference diet cards. [*Id.*] At meal-time, inmates would present their personal preference diet card, and the food service supervisor would make a record of it. [*Id.* at 6.] The supervisor then inspected the inmate's tray "to ensure it [was] made correctly." [*Id.*]

When pre-packaged kosher meals were served on a daily basis, the lunch and dinner meals were pre-packaged, but the breakfast meals were not. [Dkt. 84 at 5.] The breakfast meal was served with no meat and with the kosher ingredients that were set aside for the kosher meals.

[*Id.*]  To reduce the risk of contamination between kosher and non-kosher foods, breakfasts were to be prepared without utensils when possible, and all items used to prepare and serve the breakfast meals were disposed of after the meal.  [*Id.*]  The cost of disposable utensils for the breakfast meal was included in the per-meal cost charged by Aramark to DOC.  [*Id.* at 6.]

Other kosher foods, including tuna and peanut butter, were available for inmates to purchase from the commissary.  [*Id.*]  The DOC also provided, and continues to provide, "lacto-ovo vegetarian" diet options (i.e., vegetarian meals that may include eggs and dairy) and diets without red meat, which were prepared with the regular meals and separated at the time of serving, thereby rendering them non-kosher.  [*Id.* at 6.]  These types of meals involve kosher ingredients, though aren't necessarily kosher given the way they are prepared.  [Dkt. 83-8 at 6.]

In addition to pre-packaged kosher diets, the DOC briefly provided Hallal[2] meals to Muslim inmates.  [Dkt. 84 at 6.]  Notably, the ingredients in the pre-packaged kosher meals meet the basic requirements of Hallal, but preparation and service of Hallal meals does not present the issue of cross-contamination.  [*Id.* at 8.]

**D) Cost Reduction at DOC**

The extra cost incurred by the DOC in providing kosher meals to individuals who requested them – some of whom were non-Jewish but requested them in accordance with other religious beliefs, [dkt. 84 at 7], was initially a few thousand dollars per month.  [*Id.*]  But in the past few years, the number of kosher meals increased, in large part due to Muslim inmates who did not have access to Hallal meals but found sufficient substitutes in kosher meals.  [*Id.*]  DOC chose to accommodate the Hallal meal requests by providing pre-packaged kosher meals.  [*Id.*]  The cost of providing kosher meals increased accordingly.  [*Id.* at 7-8.]  By the fall of 2008, the

---

[2] "Hallal" is an Arabic word meaning "lawful" or "permitted" and refers to food items allowable under Islamic dietary restrictions.  [Dkt. 81 at 9.]

monthly cost of pre-packaged kosher meals had risen to between $40,000 and $60,000. [*Id.* at 9.]

On January 1, 2009, in an effort to reduce costs, the DOC began serving Hallal meals, the entrée portions of which were prepared offsite and substituted for the entrées served in regular meals. [*Id.*] The cost to DOC was $2.00 per meal above the per-capita cost, just half the cost of kosher meals. [*Id.*] However, since the number of inmates receiving Hallal meals vastly exceeded the number of inmates who had been receiving pre-packaged kosher meals, the cost of the Hallal meals continued increasing until it was over $100,000 for the month of February. [*Id.* at 10.]

In April 2008, DOC instituted a policy ("the 75-percent policy") in an attempt to curb increasing religious preference costs. DOC already had in place a policy suspending special diets for offenders who failed to pick up 25 percent of medically prescribed diets. [*Id.* at 11.] The medical diet policy was developed in part by DOC's Director of Religious Services and Community Involvement, Dr. Hall, one of the individual Defendants named here. [Dkt. 83-8 at 22.] Under the policy as amended, if an inmate with any personal preference diet card failed to "participate in" at least 75 percent of all religious meals, the personal preference diet card was suspended. [Dkt. 84 at 11.] Aramark was to provide the chaplains a weekly list showing the compliance of individual inmates. Chaplains would decide whether inmates' diet card use violated the policy. [*Id.*] If an inmate disagreed with the chaplains' decision, he could file a grievance to be reviewed at the facility. [*Id.*] The inmate could then appeal the result of the grievance to Dr. Hall. [*Id.*]

Despite this policy, the cost of religious preference diets continued growing beyond what DOC deemed, "an acceptable level due to the massive increase in the numbers of offenders who

wanted pre-packaged religious meals." [*Id.* at 12.] DOC offered no evidence that this "massive increase" was caused because of kosher meal requests.[3] There is also no evidence that DOC tried or considered ways to reduce costs of kosher meals at this point. Instead, because "the DOC did not have the funds to absorb the increase in cost of providing these meals," (again, not limited to kosher,) on June 1. 2010, the DOC "discontinue[d] providing prepackaged meals to offenders who requested personal preference diets for religious reasons and offered them vegan meals [(i.e., meals that use exclusively plant-based ingredients)] prepared in the facilities." [*Id.*] Discontinuing the pre-packaged kosher and Hallal meals reduced the DOC's additional costs to zero, as Aramark will supply vegan meals as part of its base price on the contract. [*Id.* at 12-13.]

**E) DOC's Stipulation**

DOC acknowledges, "The laws of [kosher] require Jews to keep kosher in their diet, which includes both the types of foods that may be eaten and preparation requirements to ensure those ingredients are not contaminated. [Dkt. 84 at 4.] Therefore, DOC does not claim that the vegan meals are kosher. [Dkt. 83-8 at 6.] In fact, DOC affirmatively states, "[DOC does] not offer affirmative proof that the vegan meals are in fact kosher according to the plaintiff's definition." [Dkt. 90 at 3.]

Instead, DOC asserts that the food is "being served as part of a menu that does not contain items that are restricted by the laws of kosher." [*Id.*] Nevertheless, despite the fact that the ingredients used in vegan meals are themselves kosher, the parties agree that a meal made from

---

[3] DOC includes the number of inmates receiving Hallal meals in this increase because the cost of providing Hallal meals was likewise added to the base cost Aramark relied upon to bill the DOC for providing regular meals. [*Id.* at 9.] Indeed, in April 2009, 93 offenders at MCF were receiving Hallal diets, while only 35 were receiving kosher meals. [Dkt. 83-15 at 3-4.] However, Hallal diets are not the subject of this litigation and should not feature in DOC's figures regarding the cost of kosher meals.

these ingredients is not necessarily kosher: The problem lies in the preparation, for if, at any point, non-kosher ingredients, water, or plates/utensils that have touched non-kosher food contaminates the vegan food, the meal is no longer kosher. [Dkt. 83-6.]

**F) Vegan as an Alternative to Kosher**

Despite its acknowledgement that vegan meals are not necessarily kosher, DOC attempts to prepare vegan food in accordance with kosher principles. [Dkt. 84 at 13.] However, these attempts are not failsafe. For example, in every facility, there is a separate area for the preparation of vegan food; and pots, pans, utensils, and trays are specifically designated to be used for vegan food preparation. [*Id*.] Nevertheless, the same dishwashers and three-bay sinks that are used to wash these items are used to prepare and serve non-vegan meals, in violation of the laws of kosher. [*Id*.] Although the dishwashers and three-bay sinks are "supposed to be completely cleaned and sanitized before washing" anything used to prepare and serve vegan meals, DOC can offer no assurance that this process is actually carried out at every meal. [*Id*.] Likewise, sporks, cups and glasses are "supposed to be identified as vegan," and washed and stored separately from trays on which non-vegan meals are served, but this policy may have little bearing on actual DOC practice.[4] [*Id*; dkt. 83-2 at 15.] Finally, although there are separate sponges and rags to clean food surfaces that are designated for vegan food, there is no supervision of their actual use. [*Id*.]

In an effort to regulate these policies, two DOC employees perform unannounced on-site audits of all DOC facilities in which Aramark provides food services. [Dkt. 83-1 at 5.] Additionally, DOC conducts follow-up audits to ensure that issues identified in an audit are resolved. [*Id*.] The DOC has audited every facility serving vegan meals, and "none of these audits are

---

[4] Spoons, spatulas, pans to hold food, stock pots and the like were etched with marks to identify them as vegan. [*Id*. at 55.]

known to have revealed any significant issues concerning actual or potential contamination of vegan meals being prepared in the same facility as non-kosher meals." [*Id*. at 6.] But although DOC's audits do include a review of food service operations of vegan meals to ensure guidelines separating vegan from regular meals are met, [*id*. at 5], the audits themselves are simply to ensure that food services meet "minimum accreditation standards" and to address any issue identified by the Department of Health – not to ensure compliance with the laws of kosher. [*Id*. at 5.] DOC therefore recognizes that these practices simply "decrease the likelihood of cross-contamination of vegan meals" – they do not eliminate the possibility. [Dkt. 84 at 15.]

DOC maintains that imposing stricter measures to ensure non-contamination would be costly: "It is far cheaper to use re-usable trays and silverware and wash them." [*Id*.] It says that it will continue to attempt to improve its procedures to ensure vegan meals can be prepared in a kosher manner, but that there are no known alternatives that will not increase the costs to DOC. [*Id*.] That said, the DOC has made no attempt to determine if other providers could deliver kosher diets less expensively or to quantify the alleged expense associated with improved supervision. [Dkt. 89 at 13.]

## G) Maston Willis

Maston Willis is an Orthodox Jew who has been continuously incarcerated in DOC since 2003. [Dkt. 83-14 at 2-3.] Mr. Willis' incarceration has been primarily at Miami Correctional Facility ("MCF"). [*Id*. at 2.] Consistent with the traditions of Orthodox Judaism, observing the laws of kosher are essential to Mr. Willis' faith. [*Id*. at 3-4.] According to Mr. Willis, whether or not food is kosher depends on the ingredients and how it is prepared, and he will not eat unre-

liably prepared meals.[5]  [Dkt. 83-14 at 7.]  Like many observant Jews, Mr. Willis will not consume dairy for six hours after eating meat.  [*Id.* at 19.]

Mr. Willis eats neither the vegan meals nor the vegetarian meals because they are not kosher.  [Dkt. 83-14 at 19.]  When kosher diets were available at MCF, Mr. Willis signed up for and received the kosher food.  [*Id.* at 8.]  But because breakfast at MCF was not pre-packaged, Mr. Willis did not eat it out of concern about cross-contamination.  [*Id.*]  So that he did not have to stand in line and pick up a non-kosher breakfast only to throw it away, Mr. Willis obtained permission from an official to stay in his cell during breakfast.  [Dkt. 89 at 25.]  He obtained this permission before the 75-percent policy was imposed.  [Dkt. 95 at 19.]  At this point, it "may have been possible" for Mr. Willis to try to go through the breakfast line and submit his diet card for his participation to be marked and then decline to accept the meal.  [Dkt. 84 at 20.]  In April 2009, upon learning that Mr. Willis only used his diet card for 62 percent of meals, Chaplain Hodges, the other Defendant in this case, suspended Mr. Willis' diet card.  [Dkt. 83-14 at 16.]

In May 2009, MCF discontinued the distribution of pre-packaged kosher meals altogether.  [Dkt. 84 at 21.]  Any inmate who requested a diet for religious reasons was instead offered a personal preference diet card for a vegan meal.  [*Id.*]  On May 26, 2007, Mr. Willis requested in writing that his kosher diet be restored the next day.  [*Id.*]  Chaplain Hodges approved the request but offered Mr. Willis the vegan diet.  Mr. Willis refused.  [*Id.*]

---

[5] Kosher food items often have labels with symbols indicating who conducted the kosher certification; some of the symbols are more reliable than others.  For instance, "O-U" is the most reliable because it has been certified by a rabbi.  A "K" indicates the item is kosher but does not indicate a rabbi has ever toured the food production facility and so this designation is less reliable. Mr. Willis does not eat food with only the "K" designation.  [Dkt. 83-14 at 7.]

Mr. Willis grieved the revocation of his kosher diet card, and the prison's administrative assistant denied his grievance. [*Id.*] Mr. Willis then appealed his grievance, and his appeal was likewise denied. [*Id.*]

## III.

### DISCUSSION

In Count I of his Second Amended Complaint, Mr. Willis alleges, on behalf of the class, that the denial of kosher meals for inmates[6] who requested them for religious reasons violates the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1(a). In Count II, Mr. Willis seeks declaratory[7] relief against DOC for implementing a policy that violated his rights under RLUIPA. [Dkt. 84 at 1.] He further seeks nominal damages under § 1983 against Defendants Dr. Hall and Chaplain Hodges for creating and enforcing DOC policy that required inmates to use their religious diet cards for at least 75 percent of prison meals, lest the card be revoked, in violation of the First Amendment. [*Id.*]

### A) Does the DOC's Termination of Kosher Diets Violate RLUIPA?

RLUIPA was "enacted . . . in part, to protect inmates and other institutionalized persons from substantial burdens in freely practicing their religions." *Charles v. Verhagen*, 348 F.3d 601, 606 (7th Cir. 2003). The burden of implementing RLUIPA applies to any facility owned or operated by a state including prisons – but only if the prison system receives federal funding. 42 U.S.C. §§ 2000cc-1, 1997(1). Because the parties agree that the DOC has received the benefit of

---

[6] At the time kosher diets were suspended, approximately 99 prisoners were authorized to receive kosher diets, and 23 Jewish prisoners were temporarily suspended from those diets; during the last Passover holiday, 74-79 prisoners received kosher meals. [Dkt. 80-21 at 3.]

[7] Plaintiffs also request that the Court enjoin DOC from terminating the religious diets of plaintiff and the putative class and order that kosher diets be restored and continued into the future for qualified prisoners; however, neither party has cogently addressed the propriety or scope of injunctive relief. [Dkt. 17 at 13.] At this point, therefore, the Court assesses only the request for declaratory relief.

federal funding for its facilities, it is obligated to comply with the conditions Congress attached to that funding. [Dkt. 17 at 5.] Accordingly, RLUIPA prevents the DOC from imposing "a substantial burden on the religious exercise" of inmates, unless it "demonstrates that imposition of the burden . . . (1) is in furtherance of a compelling government interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a).

In making a claim under RLUIPA, a plaintiff inmate bears the burden of persuasion on the issue of whether the challenged practices substantially burden the exercise of their religion. 42 U.S.C. § 2000cc-2(b). Once an inmate establishes "this prima facie case, the defendants bear the burden of persuasion on any [other] element of the claim, . . . namely whether their practice is the least restrictive means of furthering a compelling governmental interest." *Koger v. Bryan*, 523 F.3d 789, 796 (7th Cir. 2008) (quotations omitted).

### 1. Do Kosher Diets Constitute Religious Exercise under RLUIPA?

The first question under RLUIPA is whether the termination of kosher diets affected a "religious exercise," which statute defines as "exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(a). "Although RLUIPA bars inquiry into whether a particular belief or practice is 'central' to a prisoner's religion . . . the Act does not preclude inquiry into the sincerity of a prisoner's professed religiosity." *Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005).

Here, the DOC does not dispute either that a kosher diet is part of the sincerely held religious beliefs and practices of some observant Jews, or that it is fundamental to the sincerely held religious beliefs and practices of Plaintiffs. [Dkt. 89 at 13; dkt. 84 at 16.] Accordingly, the Court finds that keeping kosher constitutes religious exercise for Plaintiffs.

### 2. Does Denial of Kosher Diets Create a "Substantial Burden" under RLUIPA?

Plaintiffs bear the burden of persuasion on the issue of whether the challenged practices "substantially burden" the exercise of their religion. 42 U.S.C. § 2000cc-2(b). The term "substantial burden" as used in RLUIPA is not specifically defined in the statute. However, the Seventh Circuit has "held that in the context of RLUIPA's broad definition of religious exercise, a . . . regulation that imposes a substantial burden on religious exercise is one that necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise . . . effectively impracticable." *Koger*, 523 F.3d at 799 (quoting *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 761 (7th Cir. 2003)). In the specific context of dietary restrictions, the Seventh Circuit has held that "a prisoner's religious dietary practice is substantially burdened when the prison forces him to choose between his religious practice and adequate nutrition." *Nelson v. Miller*, 570 F.3d 868, 869 (7th Cir. 2009) (finding that denying a non-meat diet during Lent and on Fridays substantially burdened the religious practice of a Roman Catholic prisoner). The Seventh Circuit has further noted that for an observant Jew, demanding a kosher diet is tantamount to "asking for accommodation of a religious exercise rooted in sincerely held beliefs." *Koger*, 523 F.3d at 798; *see also Hunafa v. Murphy*, 907 F.2d 46, 47 (7th Cir. 1990) (involving Muslim inmates forced to choose between pork and inadequate nutrition). Thus, if the evidence reveals that DOC denies kosher meals in violation of the plaintiff inmates' religious dietary practices, Plaintiffs will have established a prima facie case. *Nelson*, 570 F.3d at 869.

In response to Plaintiffs' argument that the denial of kosher meals burdens their religious exercise, the DOC does not claim to provide kosher meals. [Dkt. 83-8 at 20-21.] It does, however, maintain that "the food [(i.e., vegan food)] is being served as part of that menu does not contain items that are restricted by the laws of kosher." [*Id.*] In other words, the DOC uses kosher ingredients, but does not guarantee meals prepared according to kosher law. The DOC's

argument, therefore, is that "[a]lthough it may be a substantial burden to a Jewish prisoner's exercise to be required to eat food that is not kosher, the *mere risk* of food with kosher ingredients being contaminated and rendered non-kosher does not present a substantial burden to a prisoner." [Dkt. 84 at 23 (emphasis added).] The DOC goes on to argue (although not until its reply) that because varying degrees of observance exist within the class and within Judaism at large – some of which adhere to the laws of kosher and some of which do not – providing kosher meals to every individual involved in this litigation means that "the State has effectively aligned itself with one side of an internal debate within Judaism," [dkt. 95 at 16], potentially in violation of the Establishment Clause. [Dkt. 95 at 15.]

The Court must, however, reject the DOC's argument for three reasons. First, the provision of kosher meals does not burden any inmate – Jewish or not – who prefer to eat non-kosher meals. The class here is limited to individuals who have self-identified as requiring a kosher diet to properly exercise their religious beliefs. The parties agree that the term "kosher" implicates not only ingredients but also method of preparation. Second, merely reducing the risk that kosher ingredients are contaminated does not make vegan meals kosher, nor does DOC argue otherwise. Finally, the only question at issue here, based on the plain language of RLUIPA, is whether having access to kosher foods is part of the sincere religious exercise of Plaintiffs. 42 U.S.C. § 2000cc-2(a). Again, the parties agree that keeping kosher is part of Plaintiffs' sincerely held religious beliefs, and the class is so defined. Thus, the Court concludes – consistent with Seventh Circuit authority – that the DOC substantially burdened the Plaintiffs' religious exercise when it denied them kosher food. *See Nelson*, 570 F.3 at 868.

### 3. Has DOC Met Its Burden under RLUIPA?

Because Plaintiffs established that the denial of kosher diets substantially burdens their religious exercise, the DOC can only avoid a violation of RLUIPA if it can demonstrate that the

imposition of this burden furthers a compelling governmental interest and it is the least restric-
tive means of furthering that interest. 42 U.S.C. § 2000cc-1(a), -1(b).

### a) Is there a Compelling Government Interest?

In *Cutter v. Wilkinson*, 544 U.S. 709 (2005), the United States Supreme Court stressed
that RLUIPA's legislative history demands that courts enforcing the statute give "'due deference
to the experience and expertise of prison and jail administrators in establishing necessary regula-
tions and procedures to maintain good order, security and discipline, consistent with considera-
tions of costs and limited resources.'" *Id.* at 723. However, accommodating a religious practice
will generally be more expensive than a failure to accommodate; as such, RLUIPA specifically
contemplates that the law "may require a government to incur expenses in its own operations to
avoid imposing a substantial burden." 42 U.S.C. § 2000cc-3(c). Because the statute expressly
anticipates increased costs, the fact that such diets may be more costly than non-religious diets is
not alone a compelling governmental interest under the statute.

Despite the general rule that cost alone is not enough, the DOC argues that cost of kosher
diets – when added to the Hallal diets – was unacceptably high, thus creating a compelling go-
vernmental interest in reducing "spiraling costs." [Dkt. 90 at 15.] Specifically, it notes, "the mi-
nimization of costs is a compelling governmental interest now more than ever," given the one-
billion dollar expected revenue shortfall for the state. [Dkt. 84 at 28.]

DOC, however, has cited absolutely no relevant authority to support the conclusion that
spiraling cost alone is a compelling government interest. The DOC incorrectly cites *Baranowski
v. Hart*, 486 F.3d 112, 125 (5th Cir. 2007), for this proposition. There, the defendants demon-
strated that a compelling governmental interest in eliminating diets existed only after they estab-
lished that 1) the Texas Department of Criminal Justice budget was not big enough to either pro-
vide a separate kosher kitchen or bring in kosher food from the outside and simultaneously pro-

vide a nutritionally appropriate meal to other offenders, and 2) that such a policy would breed resentment among inmates that would result in a security risk, and 3) that there would be an increased demand by other religious groups for similar diets. *Id.* at 125. As such, in *Baranowski*, an increase in costs was only one factor among several, including a security risk that collectively supported a compelling government interest. *Id.*

The DOC has not, however, come forth with evidence establishing the factors that were at issue in *Baranowski*. 486 F.3d at 125. Here, the DOC has only presented evidence of a budgetary shortfall, which is not itself a *Baranowski* factor. [Dkt. 83-12.] DOC argues that the mere fact that it will have to spend money to satisfy the religious needs of some prisoners is itself a compelling governmental interest. [Dkt. 83 at 28.] Insofar as the DOC asks that the Court find that a budgetary shortage alone can qualify as a compelling interest, the Court must reject that claim. *Cutter*, 544 U.S. at 709.

Furthermore, the idea that cost alone could provide a compelling government interest directly contravenes Seventh Circuit precedent. The Seventh Circuit has also noted that "orderly administration of a prison dietary system, and the accommodations made thereunder are legitimate concerns of prison officials . . . . The problem for the prison officials, however, is that no appellate court has ever found these to be compelling interests." *Koger,* 523 F.3d at 800. Without offering any additional reasons for terminating kosher meals, the Court cannot find that the government had a compelling interest that might justify burdening the religious exercise of Plaintiffs.

Equally important, DOC attempts to justify its decision to discontinue kosher meals because of the "massive increases" it incurred when it made the decision to include prisoners requesting a Hallal diet with those requesting a kosher diet. The alleged significant spikes in the

cost of kosher meals after Hallal meals were included were thus the result of the DOC's internal decision making, and not result of an increase in kosher meal requests. DOC has produced no evidence whatsoever that the cost of providing kosher foods to the more limited number of individuals in the class at issue would so "massive." Certainly, DOC would undergo increased expense were it to continue the same practice of providing the same pre-packaged kosher meals, but it has provided no evidence to suggest exactly what the cost would be to provide alternative kosher meals to the class.

The DOC has failed to meet its burden of persuasion to show a compelling government interest under RLUIPA, an essential element for which it bears the burden. Summary judgment for the Plaintiffs is therefore appropriate on this basis alone.

### b) Is Serving Vegan Meals the Least Restrictive Means of Achieving the Compelling Government Interest?

Even if the DOC could establish that its cost concerns amount to a compelling government interest, it would still have to demonstrate that substituting vegan meals for kosher ones is the least restrictive means of furthering that compelling governmental interest as is required by RLUIPA. 42 U.S.C. § 2000cc-1(a). It has not done so.

Under RLUIPA, the DOC must demonstrate that no feasible less restrictive means exist to achieve the compelling government interest. 42 U.S.C. § 2000cc-1(a). "[A] prison 'cannot meet its burden to prove least restrictive alternative unless it demonstrates that it has actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice.'" *Shakur v. Schirro*, 514 F.3d 878, 890 (9th Cir. 2008).

Here, DOC asserts that discontinuing the kosher diet was the least restrictive means of furthering its interest. [Dkt. 84 at 2.] Furthermore, DOC argues that Mr. Willis has not presented any cost-neutral alternatives that would satisfy inmates who request kosher meals. [Dkt.

95 at 14.]  In so arguing, DOC seems to misunderstand or ignore the controlling law: Under RLUIPA, it is not the plaintiff's burden to show that reasonable alternatives *do* exist – it is DOC's burden to show that reasonable alternatives do *not* exist.  42 U.S.C. § 2000cc-1(a) (emphasis added).  Moreover DOC's cost-neutrality argument directly contravenes the language of the statute which contemplates that compliance with RLUIPA "may require a government to incur expenses in its own operations to avoid imposing a substantial burden."  42 U.S.C. § 2000cc-3(c).

Although DOC contends that did in fact consider and implement several approaches to cost reduction, including allowing Muslim inmates to have prepackaged kosher meals (which, according to the prices of meals stated above, increased – rather than decreased – costs), offering Muslim inmates prepackaged Hallal entrees, and applying the 75-percent participation policy to religious meals to ensure against abuse of religious diets, [dkt. 90 at 8-9], DOC has not considered several obvious less restrictive alternatives to the termination of kosher meals, and no evidence exists in the record indicating otherwise.  [Dkt. 89 at 26.]

Although it is not their burden, Plaintiffs have provided a substantial list of additional less restrictive alternatives that DOC could have exercised, or attempted to exercise, in reducing prison costs without eliminating kosher meals altogether.  For example, the DOC never considered: whether there were less expensive kosher vendors, restructuring its contract with Aramark, creating a kosher kitchen at one of the facilities, or providing kosher meals that do not have to be frozen or refrigerated as an alternative to the frozen meals, among other alternatives.  [Dkt. 89 at 21-26.]  The DOC provides no response to Plaintiffs' suggestions.

Another alternative to terminating kosher diets outright is to strengthen safeguards to ensure against inmates abusing the religious diet system – DOC suspects false religious diet re-

quests because the meals taste better. [Dkt. 84 at 27.] DOC can resolve its suspicions by eva-luating the religious sincerity of inmates in accordance with their dietary requests, thereby whit-tling down the population eating kosher meals to only those inmates requesting them for sincere-ly held religious reasons. [Dkt. 94 at 7-8.] The parties dispute the extent to which it is appro-priate for DOC to require inmates to demonstrate their religious sincerity in the RLUIPA con-text. [Dkts. 84; 90; 91.] However, the Supreme Court has been clear on this point: "Although RLUIPA bars inquiry into whether a particular belief or practice is 'central' to a prisoner's reli-gion, see 42 U.S.C. § 2000cc-5(7)(A), the Act does not preclude inquiry into the sincerity of a prisoner's professed religiosity." *Cutter*, 544 U.S. at 725. As such, contrary to DOC's position, the Court recognizes that instituting safeguards to ensure the religious sincerity of inmates who requested kosher meals under RLUIPA – although requiring effort of prison officials – would be appropriate, feasible, and less restrictive than terminating kosher diets altogether. 42 U.S.C. § 2000cc-1(a).

Therefore, even if cost reduction alone were a compelling government interest, DOC has not met its burden of demonstrating that it considered and rejected the many obvious alterna-tives, and that no feasible less restrictive means existed to achieve that interest. 42 U.S.C. § 2000cc-1(a). On this evidentiary record, the Court has no choice but to find that, as a matter of law, the termination of kosher diets violated RLUIPA, 42 U.S.C. § 2000cc-1(a), and the Court must grant summary judgment in favor of the Plaintiffs.

**B) Does the DOC's 75-Percent Policy as Applied to Mr. Willis Violate His Individual Rights?**

In addition to requesting summary judgment on behalf of the class, Mr. Willis seeks individual declaratory[8] relief under RLUIPA and under 42 U.S.C. § 1983 for First Amendment violations concerning the application of the 75-percent policy. [Dkt. 81 at 29.] He further seeks nominal damages under § 1983 against Dr. Hall and Chaplain Hodges in their individual capacities, but because § 1983 does not provide a cause of action for damages against state agencies, he does not seek any damages against the DOC itself. [*Id.*]

**1) Have Mr. Willis's First Amendment Rights been Violated?**

The parties agree that the United States Supreme Court decision in *Turner v. Safley* lays out the calculus for determining the extent of inmates' First Amendment rights. 482 U.S. 78 (1987). It held that the government violates the First Amendment if it burdens fundamental rights for reasons not "reasonably related" to legitimate penological interests. *Id.* at 87. While the courts must show deference to prison officials' policy making expertise, the reasonableness of their regulations will be tested against four factors:

- o whether the regulation has a valid, rational connection to a legitimate governmental objective;
- o whether there are alternative means for the prisoners to exercise the rights in question;
- o what impact will accommodation of the right in question have on guards and other inmates and on the allocation of prison resources generally;
- o whether there are ready alternatives to the regulation in question. "[T]he absence of ready alternatives is evidence of the reasonableness of a prison regulation . . . . By the same token, the existence of obvious, easy alternatives, may be evidence that the regulation is not reasonable, but an 'exaggerated response' to prison concerns."

*Id.* at 89-90.

---

[8] Mr. Willis also seeks injunctive relief, [dkt. 17 at 13], but given that he has not yet properly illustrated the scope of relief sought, the Court will address only declaratory relief.

With respect to the first factor, the legitimate government interest proffered by the DOC in support of the 75-percent policy is saving costs by reducing the number of inmates who receive kosher meals without a sincere religious reason. [Dkt. 83-10 at 4-5.] The evidence establishes, however, that its application to Mr. Willis does not rationally relate to this purpose. *Turner*, 482 U.S. at 89.

The challenge made here is against the regulation as applied to Mr. Willis.[9] [Dkt. 89 at 35.] Mr. Willis was suspended from his kosher diet because did not eat 75 percent of his meals. [Dkt. 94 at 8.] The undisputed evidence shows that Mr. Willis ate all of the pre-packaged kosher meals available, [dkt. 89 at 25], but those meals were not sufficient to push him over the 75-pecent threshold because pre-packaged kosher meals were only served at two-thirds of mealtimes. Mr. Willis's religious beliefs prevented him from eating breakfast; he did not consider the breakfasts kosher. He lost the ability to eat kosher meals either because the DOC did not provide enough kosher meals in the first place, or because DOC chose a benchmark in excess of the percentage of kosher meals it provided. Given that Mr. Willis sincerely believed the breakfasts DOC provided weren't not kosher, he was doomed to fail once the 75-percent policy was enacted as he was only served kosher meals 66% of the time. Enforcing the 75-percent policy against Mr. Willis does not further the legitimate government interest of screening out insincere inmates – it actually punishes an inmate whose sincerity is not in question. *Turner*, 482 U.S. at 89.

The additional *Turner* prongs likewise favor Mr. Willis. There is no dispute that when Mr. Willis's diet card was taken, he had no alternative to the kosher diet that enabled his religious exercise – he could only receive non-kosher meals for breakfast, which his religious beliefs prevented him from eating. [Dkt. 81 at 31.] Moreover, continuing to provide Mr. Willis with

---

[9] Neither party disputes that the regulation, as applied, should be assessed under the *Turner* factors.

- 21 -

kosher meals during the final month before the diets were terminated would have had minimal impact on prison resources. [*Id.*] Finally, as Mr. Willis rightly points out, the clear ready alternative to enforcing this regulation against him would have been to enforce the policy against individuals who were using religious diet cards without a true religious commitment, or to reduce the percentage to one corresponding to the number of kosher meals actually served.[10] [*Id.*]

Because the DOC's enforcement of its 75-percent policy against Mr. Willis fails each prong of the *Turner,* its application to him violates his First Amendment rights. 482 U.S. at 78.

### 2) In Light of the First Amendment Violation, Is DOC Liable for Violating Mr. Willis's RLUIPA Rights?

The First Amendment standard is less demanding on the DOC than RLUIPA in this context. Accordingly, if a First Amendment violation is found, a RLUIPA violation also exists. *Harvey v. Adams County Sheriff's Office,* 2008 WL 2396761 *2. ("Because the defendants have not established that the failure to provide a kosher diet was reasonable under the First Amendment, they have also failed to meet RUILPA's more demanding standard."). Therefore, because termination of kosher meals violates Mr. Willis's First Amendment rights, it necessarily violates his rights under the more demanding RUILPA standard. *Id.* The Court therefore finds that Mr. Willis is entitled to declaratory relief against DOC for violating his rights under RLUIPA.

---

[10] The Court recognizes that this alternative would involve screening for religious sincerity of inmates. However, as stated above, this is not beyond the purview of DOC and would, to the contrary, help the DOC ensure rational application of its religious diet regulations.

### 3) Is Mr. Willis Entitled Nominal Damages against Dr. Hall and Chaplain Hodges under § 1983?

In addition to seeking declaratory relief against DOC under RLUIPA, Mr. Willis seeks nominal damages against Dr. Hall and Chaplain Hodges in their individual capacities under § 1983 for the violation of his First Amendment rights.[11] [Dkt. 89 at 25.]

Mr. Willis seeks nominal damages against Dr. Hall for formulating, and against Chaplain Hodges for applying, the 75-percent policy that resulted in the denial of Mr. Willis' constitutional rights. [Dkt. 89 at 26.]

To prevail on a § 1983 claim, Mr. Willis must establish that (1) he had a constitutionally protected right, (2) he was deprived of that right in violation of the Constitution, (3) the defendant intentionally caused that deprivation, and (4) the defendant acted under color of state law. *McNabola v. Chicago Transit Authority*, 10 F.3d 501, 513 (7th Cir. 1993). Liability can be based only on a finding that conduct causing a constitutional deprivation occurred at the defendant's direction or with his knowledge and consent. *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). In other words, the official sued "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye…." *Id*. The Seventh Circuit has stated that "in order [for an inmate] to recover damages against a state actor under § 1983, a plaintiff must show the actor was 'personally responsible for the constitutional deprivation.'" *J.H. ex rel. Higgin v. Johnson*, 346 F.3d 788, 793 (7th Cir. 2003).

As discussed above, the 75-percent policy violated Mr. Willis's First Amendment rights; therefore, the first two elements of liability are established as to both Dr. Hall and Chaplain

---

[11] Mr. Willis concedes that under the Prison Litigation Reform Act, 42 U.S.C. § 1997e(e), which circumscribes the scope of damages available to inmates, a violation of his First Amendment rights, absent physical injury, only entitles him to nominal damages. *Calhoun v. DeTella*, 319 F.3d 936 (7th Cir. 2003).

Hodges. Additionally, there is no dispute that the Defendants were acting under color of state law. With respect to both Defendants, the question is whether the third element is met.

With respect to Dr. Hall, Mr. Willis asserts that Dr. Hall's development of 75-percent policy against him constituted a knowing violation of his constitutional rights. However, insofar as this is not a facial challenge to the 75-percent policy, Mr. Willis only seeks to hold Dr. Hall liable for implementing this policy against Mr. Willis. To this point, Defendants assert that it was John Schilling's April 8, 2009 email that effectuated the implementation of the 75-percent policy against inmates with religious preference diets. [Dkt. 84 at 30.] Mr. Willis does not dispute this assertion. Moreover, although Dr. Hall denied Mr. Willis's appeal, this denial alone is not actionable. *See Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) (denial of a prisoner's grievance is not actionable as a deprivation of a constitutional right.) Therefore, as a matter of law, Dr. Hall is not liable for nominal damages.

As to Chaplain Hodges, Mr. Willis asserts that Chaplain Hodges is liable for nominal damages for enforcing the policy that violated his constitutional rights. Whether Chaplain Hodges intentionally violated Mr. Willis's constitutional rights depends on whether Chaplain Hodges knew that in directing the confiscation of Mr. Willis's diet card, he was in fact preventing Mr. Willis from complying with the laws of kosher. *Gentry*, 65 F.3d at 561.

Record testimony[12] reveals that Chaplain Hodges knew that the breakfast meals were not kosher, and that Mr. Willis did not eat the breakfast meals for that reason. [Dkt. 80-5 at 18-20.] Mr. Willis testified that upon directing the confiscation of Mr. Willis's meal card, Chaplain Hodges spoke to Mr. Willis in his office and said that "he wasn't a bad guy, he wasn't trying to

---

[12] For the purpose of this issue, the evidence is reviewed in the light most favorable to the non-moving DOC. *Celotex*, 477 U.S. at 330.

violate [Mr. Willis's] rights, although he did agree it was a First Amendment Violation." [Dkt. 80-5 at 20.]

DOC is silent in response to the assertion that when Chaplain Hodges ordered the removal of Mr. Willis's diet card, he knowingly violated Mr. Willis's First Amendment rights. Instead, Chaplain Hodges argues that he never discriminated against Mr. Willis; rather, he even-handedly applied DOC's 75 percent policy.[13] [Dkt. 83-15 at 5.] However, knowingly applying a policy in violation of an inmate's First Amendment rights – even if even-handedly – is not permitted under § 1983. Since Chaplain Hodges does not dispute Mr. Willis's assertion that he knowingly violated his First Amendment rights, the Court finds that he is personally responsible for the constitutional deprivation. Accordingly, he is liable for nominal damages. *Gentry*, 65 F.3d at 561.

Therefore, the Court determines that, as a matter of law, that Mr. Willis is not entitled to nominal damages against Dr. Hall. Mr. Willis is, however, entitled to nominal damages against Chaplain Hodges.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiff's Motion for Summary Judgment. [Dkt. 80.] The motion is granted with respect to Count I. As to Count II, the Court finds that the DOC violated Mr. Willis's First Amendment

---

[13] Chaplain Hodges further states that insofar as there was nothing precluding Mr. Willis from going through the line at breakfast (and then declining to accept the meal) to meet the 75-percent threshold, [dkt. 83-15 at 5], Mr. Willis was in fact responsible for the confiscation of his card and therefore the deprivation of his own rights. [Dkt. 84 at 32.] There is conflicting evidence as to the feasibility of Mr. Willis's alternatives to violating the 75-percent policy. [Dkt. 85 at 15; dkt. 83-15 at 5.] But that evidence does not itself raise a genuine issue of material fact – Mr. Willis's alleged option to go through the breakfast line does not abdicate Chaplain Hodges of his responsibility to respect Mr. Willis's First Amendment rights, nor does it bear on Chaplain Hodges's personal involvement in the deprivation of Mr. Willis's rights.

and RLUIPA rights. The Court grants his claim for nominal damages against Chaplain Hodges and denies his claim as against Dr. Hall.

The Court further **GRANTS IN PART AND DENIES IN PART** Defendants' Motion for Summary Judgment. [Dkt. 83.] As to Count I, summary judgment is denied. As to Count II, the Court grants summary judgment with respect to Mr. Willis's claim against Dr. Hall and denies summary judgment with respect to his claim against DOC and Chaplain Hodges.

Mr. Willis, on behalf of himself and the class, requests injunctive relief in accordance with this Court's declaratory judgment. DOC does not dispute that insofar as the class as a whole, and Mr. Willis individually, are entitled to declaratory relief, they are likewise entitled to injunctive relief. However, at this point, neither party has presented cogent argument as to whether injunction should issue, nor illustrated what the scope of any injunction should be.

Therefore, the Court will conduct a hearing on the scope of injunctive relief to take place on **November 30 at 1:30 pm** in Room 307 at US Courthouse, 46 East Ohio Street, Indianapolis, Indiana. Each side will have 20 minutes for oral argument. The parties are encouraged to meet and confer, with the assistance of the Magistrate Judge if requested, to attempt to agree on the terms of an injunction. If the parties cannot agree, they must each file a proposed form of injunction by **November 23**.

11/01/2010

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only**:

Eric James Beaver
INDIANA OFFICE OF THE ATTORNEY GENERAL
eric.beaver@atg.in.gov

Kenneth J. Falk
ACLU OF INDIANA
kfalk@aclu-in.org

Cory Christian Voight
INDIANA OFFICE OF THE ATTORNEY GENERAL
cory.voight@atg.in.gov

FAILIS RAMSEY
905561
INDIANA STATE PRISON
Inmate Mail/Parcels
One Park Row
MICHIGAN CITY, IN 46360

JOSEPH T. WILLIAMS-EL
910763
One Park Row C East 231
Michigan City, IN 46360

EARL RAHEEM
INDIANA STATE PRISON
INDIANA STATE PRISON
Inmate Mail/Parcels
One Park Row
MICHIGAN CITY, IN 46360

ROMAN JONES
INDIANA STATE PRISON
INDIANA STATE PRISON
Inmate Mail/Parcels
One Park Row
MICHIGAN CITY, IN 46360

T. HARRIS
INDIANA STATE PRISON
INDIANA STATE PRISON
Inmate Mail/Parcels
One Park Row
MICHIGAN CITY, IN 46360

BRIAN K. GREER
881058
INDIANA STATE PRISON
INDIANA STATE PRISON
Inmate Mail/Parcels
One Park Row

MICHIGAN CITY, IN 46360